# UNITED STATES DISTRICT COURT
# DISTRICT OF COLORADO

Civil Action No. _____

**PEGGY FOLEY**

     *Plaintiff*,

  **v.**

**MERCK & CO., INC.,**
**A New Jersey Corporation,**

**MERCK SHARP & DOHME CORP.**
**A New Jersey Corporation,**

     **and**

**TEVA PHARMACEUTICALS USA, INC.**
**A Delaware Corporation**

     *Defendants.*

## COMPLAINT AND JURY DEMAND

Plaintiff Peggy Foley, by and through her counsel, and for her Complaint against Defendants, alleges as follows:

## PARTIES

1.     Plaintiff Peggy Foley is a resident and citizen of the City of Pueblo in the State of Colorado, which is located in Pueblo County, Colorado.

2.     Plaintiff was prescribed and ingested the prescription drugs Fosamax, Fosamax Plus D (hereinafter collectively referred to as "Fosamax"), and Alendronate Sodium, the generic equivalent of Fosamax, in the State of Colorado.

3.     As a result of using Fosamax and its generic equivalent, Plaintiff suffered a fracture of her left femur in the State of Colorado.

4.      For purposes of this Complaint, Fosamax and its generic equivalent Alendronate Sodium may be used interchangeably.

5.      Defendant Merck & Co., Inc. is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business in New Jersey.   The Defendant's principal office is located at One Merck Drive, Whitehouse Station, New Jersey.

6.      On or about November 3, 2009, Merck & Co., Inc. merged with another pharmaceutical company by the name of Schering-Plough Corporation.   As a result of the merger, Schering-Plough Corporation acquired all of the shares of Merck & Co., Inc., which became a wholly owned subsidiary of Schering-Plough Corporation and was renamed Merck Sharp & Dohme Corp.  Schering-Plough Corporation continued as the surviving public company and was renamed Merck & Co., Inc.

7.      Defendant Merck Sharp & Dohme Corp. is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business in New Jersey.

8.      Defendant Merck Sharp & Dohme Corp. is a wholly owned subsidiary of the new Merck & Co., Inc., and it is identified as such on the product labeling for the prescription drugs Fosamax and Fosamax Plus D (hereinafter collectively referred to as "Fosamax.").

9.      Defendants Merck Sharp & Dohme Corp. and Merck & Co., Inc. shall hereinafter be collectively referred to as "Merck" or the "Merck Defendants."

10.     At all relevant times, Merck transacted and conducted business in the State of Colorado, and derived substantial revenue in the State of Colorado and through interstate commerce, and they continue to do so.

11.     At all relevant times, Merck expected or should have expected that their actions or omissions would have consequences within the United States of America, and in the State of Colorado, and derived substantial revenue from interstate commerce.

2

12.     At all relevant times, Merck, through their agents, servants, employees and apparent agents, were the designers, manufacturers, marketers, distributors, and sellers of the prescription drug Fosamax, a bisphosphonate drug used primarily to mitigate or reverse the effects of osteoporosis, osteopenia, and Paget's Disease.

13.     Defendant Teva Pharmaceuticals USA, Inc. is a Delaware corporation with its principal place of business located at 1090 Horsham Road, North Wales, Pennsylvania 19454.

14.     Teva Pharmaceuticals USA, Inc. is a wholly-owned subsidiary of Teva Pharmaceuticals Industries Ltd. and is the company's operating business entity for the North American region and throughout the United States of America.

15.     Defendant Teva Pharmaceuticals USA, Inc. is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the generic version of Fosamax, which is referred to simply as Alendronate Sodium Tablets.

16.     Defendant Teva Pharmaceuticals USA, Inc. lists Alendronate Sodium Tablets as one of its products on its website (www.tevausa.com).

17.     At all relevant times, Defendant Teva Pharmaceuticals USA, Inc. conducted regular and sustained business in the State of Colorado by selling and distributing its products in the State of Colorado and engaged in substantial commerce and business activity in Pueblo County, Colorado.

18.     Defendant Teva Pharmaceuticals USA, Inc. shall hereinafter be referred to as "Teva" or "Defendant" and may be collectively referred to along with the Merck Defendants as "Defendants."

## JURISDICTION AND VENUE

19.     Plaintiff is a resident of the State of Colorado.

20.     Defendants Merck, Inc. and Merck Sharp & Dohme, Corp. are incorporated and have their principal place of business in the State of New Jersey.

21.     Defendant Teva Pharmaceuticals USA, Inc. is incorporated in the State of Delaware and has its principal place of business in the State of Pennsylvania.

22.     The amount in controversy, exclusive of interest and costs, far exceeds $75,000.00.

23.     This Court has jurisdiction pursuant to 28 U.S.C. §§1332, as complete diversity exists between Plaintiff and Defendants and Plaintiff is seeking recovery of more than $75,000.00.

24.     Venue is proper within this district pursuant to 28 U.S.C. §1391 because a substantial part of the events giving rise to this action occurred in this district, as Plaintiff Peggy Foley lived in this district and used Fosamax at the time of her injuries.

## FACTUAL BACKGROUND

### Nature of Plaintiff's Case

25.     Plaintiff Peggy Foley brings this case against Defendants for injuries and damages associated with her ingestion of the pharmaceutical drug Fosamax and its generic equivalent Alendronate Sodium.

26.     Fosamax is an oral drug designed, manufactured, supplied, marketed, and distributed by Merck.  Plaintiff Peggy Foley used Fosamax and/or its generic equivalent for over 8 years, during which time she was hospitalized and diagnosed with a fracture of her left femur. Specifically, on our about July 23, 2009, while using Fosamax, Plaintiff was diagnosed with a fracture of her left femur.  As discussed herein, Plaintiff's femur fracture occurred as a direct and

4

proximate result of her use of Fosamax and its generic equivalent, Alendronate Sodium, for approximately 8 years.

## Nature of the Drug Fosamax

27.     At all relevant times Defendants were responsible for, or involved in, designing, manufacturing, marketing, advertising, distributing, and selling the prescription drug Fosamax and its generic equivalent, Alendronate Sodium.

28.     In September 1995, the United States Food and Drug Administration ("FDA") approved Merck's compound Alendronate Sodium for various uses, including the treatment of osteoporosis and Paget's disease.  Alendronate Sodium is marketed by Merck under the brand name Fosamax.

29.     The generic version of Fosamax, which is manufactured and sold by Teva, was approved by the FDA on February 6, 2008.

30.     Fosamax falls within a class of drugs known as bisphosphonates.

31.     There are two classes of bisphosphonates:  the N-containing (nitrogenous) and the non-N-containing (non-nitrogenous) bisphosphonates.  The nitrogenous bisphosphonates include Pamidronate (marketed as Aredia), Ibandronate (marketed at Boniva), Risedronate (marketed as Actonel), Zolendronate (marketed as Zometa), and Alendronate (marketed as Fosamax).  The non-nitrogenous bisphosphonates include etridonate (marketed at Didronel), clodronate (marketed as Bonefos and Loron), and tiludronate (marketed as Skelid).

32.     Fosamax and other bisphosphonates are indicated for several health conditions, including treatment and prevention of osteoporosis in postmenopausal women, treatment to increase bone mass in men with osteoporosis, treatment of glucocorticoid-induced osteoporosis in men and women receiving glucocorticoids daily with low bone mineral density, and treatment of Paget's disease in men and women.

33.    Osteoporosis is a condition in which the loss of living bone tissue causes the bones to become more fragile.  Osteoporosis can occur when a there is a decrease in vitamin D and estrogen deprivation, which is why post-menopausal women are at an increased risk for osteoporosis.

34.    More specifically, estrogen deprivation can cause an increase in the number of osteoclasts that are brought to the bone tissue.  Osteoclasts are specific types of bone cells that remove bone tissue by removing its mineralized matrix and breaking up the organic bone.  This process is called bone resorption.  Osteoblasts, on the other hand are types of bone cells that develop bone tissue.  Osteoclasts and osteoblasts work together to continuously breakdown and rebuild bone tissue.  This process of continuous remodeling of the bone tissue provides bone with more durability.

35.    Bisphosphonates such as Fosamax are indicated for osteoporosis prevention by reducing the activity of osteoclasts in bone tissue.  Fosamax is considered "antiresorptive" because it decreases the activity of the osteoclasts, which consequently decreases bone breakdown.

36.    However while decreasing the activity of the osteoclasts, Fosamax also increases bone mineralization.  Bone mineralization in turn can increase brittleness of the bone.

37.    Also, Fosamax binds very tightly within bone tissue and is long-lasting, so that it is recycled as the bone is constantly being remodeled.  Because Fosamax binds so tightly and is so long-lasting, it remains biologically active for over 10 years after the final dose is used.

38.    Merck's labeling for Fosamax states: "The safety and effectiveness of Fosamax for the treatment of osteoporosis are based on clinical data of four years duration.  The optimal duration of use has not been determined."

39.     Fosamax has been one of Merck's top selling drugs, having averaged more than $3 billion a year in sales in previous years.

40.     Although Fosamax has been one of Defendants' most profitable prescription drugs, there are serious adverse health events associated with Fosamax, which have recently become a matter of public attention.

41.     Studies, clinical trials, and other information have recently confirmed two distinct signature injuries that are associated with the use of Fosamax.  First, studies have demonstrated a causal connection between the use of Fosamax and the onset of osteonecrosis of the jaw ("ONJ").

42.     Second, and more recently, studies have confirmed a causal connection between the use of Fosamax and the occurrence of atypical femur fractures.

43.     These two distinct types of injuries present major health concerns to patients who have used and continue to use Fosamax.

**Fosamax and Osteonecrosis of the Jaw**

44.     Beginning in the late 1990s and into the 2000s, studies began to report the frequent and common occurrence of a condition known as osteonecrosis of the jaw ("ONJ") among individuals using nitrogenous bisphosphonates for chemotherapy.

45.     As is the case with Merck's reported and acknowledged side effects concerning irritation, erosion, and inflammation or the upper gastrointestinal tract, Merck also knew or should have known that Fosamax, as a nitrogenous bisphosphonate, shared a similar adverse event profile to the other drugs within this specific subclass of bisphosphonates (i.e. those containing nitrogen).

46.     Specifically, Merck knew or should have known that bisphosphonates, including Fosamax, inhibit endothelial cell function.  Similarly, Merck knew or should have known that

bisphosphonates also inhibit vascularization of the affected area and induce ischemic changes specific to patients' mandibles (lower jaws) and maxillae (upper jaws) and that these ischemic changes appear to be cumulative in nature.

47.     Merck also knew or should have known that these factors combine to create a compromised vascular supply in the affected area.  As a result, a minor injury or disease can turn into a non-healing wound.  This condition can progress to widespread necrosis (bone death) and osteomyelitis (inflammation of bone marrow).

48.     Once the osteonecrosis begins and becomes symptomatic, it is very difficult to treat and typically is not reversible.

49.     As such, Dentists are now being advised by dental associations to refrain from using any invasive procedure (such as drilling a cavity) for any patient on Fosamax.

50.     Shortly after Merck began selling Fosamax, reports of osteonecrosis of the jaw and other dental complications among users began surfacing, indicating that Fosamax shared the class effects of the other nitrogenous bisphosphonates.  Despite this knowledge, Merck failed to implement further study of the risk of osteonecrosis of the jaw relative to Fosamax.  Rather than evaluating and verifying the safety of Fosamax with respect to osteonecrosis of the jaw, Defendant Merck proposed further uses of Fosamax, such as Fosamax Plus D, and sought to extend the exclusivity period of Fosamax through 2018.

51.     Osteonecrosis of the jaw is a serious medical event and can result in severe disability and death.

52.     Since Fosamax was released, the FDA has received a significant number of reports of osteonecrosis of the jaw among users of Fosamax and continues to do so.

53.     On August 25, 2004, the FDA posted its ODS Postmarketing Safety Review on bisphosphonates – specifically pamidronate (Aredia), zoledronic acid (Zometa), risedronate

(Actonel), and alendronate (Fosamax) – which was an epidemiologic review of the FDA adverse events database conducted by the FDA's Division of Drug Risk Evaluation.

54.     As a result of the FDA Review, the FDA observed that the risk of osteonecrosis of the jaw was not confined to bisphosphonates used for chemotherapy.  Instead, the FDA indicated that osteonecrosis of the jaw was a class effect that specifically extended to the oral bisphosphonate, Fosamax.

55.     As a result, on January 24, 2005, the FDA recommended that Merck amend the labeling for Fosamax to specifically warn about the risk of osteonecrosis of the jaw.

56.     Prompted by the FDA, Merck eventually included information concerning ONJ in its Fosamax product labeling in July of 2005.  However, the new label is misleading as it significantly minimizes the causal connection between Fosamax and ONJ.

57.     Specifically, Merck only included references to osteonecrosis of the jaw in the PRECAUTIONS section of the product labeling as opposed to the WARNINGS section.

58.     The Precautions section referencing ONJ begins: "Osteonecrosis of the jaw (ONJ), which can occur spontaneously, is generally associated with tooth extraction and/or local infection with delayed hearing, and has been reported in patients taking bisphosphonates, including FOSAMAX.  Known risk factors for osteonecrosis of the jaw include invasive dental procedures (e.g. tooth extraction, dental implants, boney surgery), diagnosis of cancer, concomitant therapies, (e.g. chemotherapy, corticosteroids), poor oral hygiene, and co-morbid disorders (e.g. periodontal and/or other pre-existing dental disease, anemia, coagulopathy, infection, ill-fitting dentures)."

59.     Thus, while Merck's labeling concerning ONJ places great emphasis on allegedly "known" risk factors for ONJ, it fails to cite Fosamax usage as a "known" risk factor.

60.     The labeling continues, "For patients requiring invasive dental procedures, discontinuation of bisphosphonate treatment may reduce the risk for ONJ.  Clinical judgment of the treating physician and/or oral surgeon should guide the management plan of each patient based on individual benefit/risk assessment."

61.     Again, rather than affirmatively warn patients and physicians that the use of Fosamax increases a patient's risk of developing ONJ, Merck instead states in the negative that discontinuation of Fosamax may reduce the risk for ONJ in patients requiring invasive dental procedures.

62.     Thus, rather than issue a true warning to patients of the increased risk of osteonecrosis of the jaw while using Fosamax, Defendants continue to defend Fosamax, mislead physicians and the public, and minimize the significance of the FDA's unfavorable findings.

63.     As of today, several hundred plaintiffs have lawsuits pending in federal and state court by plaintiffs alleging that Fosamax caused them to suffer ONJ.  The vast majority of the ONJ cases have been transferred to, and consolidated in, the Fosamax Multidistrict Litigation in the United States District Court for the Southern District of New York.

**Fosamax and Femur Fractures**

64.     In addition to knowing of the risks of ONJ, Defendants also knew or should have known that the use of Fosamax presented an increased risk of atypical femur fractures.

65.     Indeed, published reports and studies have recently demonstrated to the medical community and the public at large that there is a causal connection between the use of bisphosphonates such as Fosamax and atypical femur fractures.

66.     For example, in March 2005, an article entitled *Severely Suppressed Bone Turnover: A Potential Complication of Alendronate Therapy* was published in the Journal of Endocrinology & Metabolism detailing a report on nine patients who sustained spontaneous

nonspinal fractures while on alendronate (Fosamax) therapy.  The report raised the possibility that severe suppression of bone turnover may develop during long-term alendronate therapy, resulting in increased susceptibility to, and delayed healing of, nonspinal fractures.  The reporters concluded, "Our observations emphasize the need for increased awareness and monitoring for the potential development of excessive suppression of bone turnover during long-term alendronate therapy."

67.     A similar report entitled *Long-term Risks of Bisphosphonates Probed* was published in the Journal of the American Medical Association in 2009.  The author of the report expressed serious concerns with prolonged use of bisphosphonates, recommended that physicians discontinue bisphosphonates treatment in patients after 5 years, and stated, "until we get more data from the industry and the FDA, we are stepping back."

68.     In February 2010, another report appeared in the journal Clinical Endocrinology entitled *Unusual Mid-shaft Fractures during Long-term Bisphosphonate Therapy.*  The reporters studied 13 women who sustained atraumatic mid-shaft fractures, 11 of which were femur fractures.  Of the 13 women, 10 had been using Fosamax from 3 to 11 years.  The reporters concluded that long-term use of bisphosphonates may increase the risk of unusual long bone mid-shaft fractures, and that the phenomenon was likely due to prolonged suppression of bone turnover, which could lead to accumulation of microdamage and development of hypermineralized bone.

69.     On March 10, 2010, in light of the many medical reports associating bisphosphonates such as Fosamax with femur fractures, the FDA issued a Safety Announcement concerning potential adverse events associated with Fosamax.

70.     In its announcement, the FDA acknowledged that recent reports raised the question of whether there is an increased risk of atypical subtrochanteric femur fractures

(fractures in the femur bone just below the hip joint), which led to the FDA conducting an ongoing investigation.

71. At that time, however, the FDA did not believe there was enough data to support a causal connection. The FDA stated in its announcement: "At this point, the data that FDA has reviewed have not shown a clear connection between bisphosphonate use and a risk of atypical subtrochanteric femur fractures." The FDA further found that, based on published case reports of atypical subtrochanteric femur fractures, as well as case reports and clinical trial data obtained from bisphosphonate drug manufacturers, the current data "did not show an increase in this risk in women using these medications."

72. Nevertheless, the FDA indicated that it was "working closely with outside experts, including members of the recently convened American Society of Bone and Mineral Research Subtrochanteric Femoral Fracture Task Force, to gather additional information that may provide more insight into this issue."

73. In September of 2010, the findings of the Task Force were published in the Journal of Bone and Mineral Research in a report entitled *Atypical Subtrochanteric and Diaphyseal Femoral Fractures: Report of a Task Force of the American Society for Bone and Mineral Research*. After reviewing numerous studies, reports, articles, and other data, the Task Force concluded that "there is evidence of a relationship between long-term [bisphosphonate] use and a specific type of subtrochanteric and femoral shaft fracture." The Task Force further concluded that "physicians and patients should be made aware of the possibility of atypical femoral fractures and of the potential for bilaterality though a change in labeling of [bisphosphonates]."

74. Based in part on the Task Force's findings, the FDA issued another Safety Announcement on October 13, 2010, concerning the class of bisphosphonates, including

Fosamax. The announcement stated: "The U.S. Food and Drug Administration (FDA) is updating the public regarding information previously communicated describing the risk of atypical fractures of the thigh, known as subtrochanteric and diaphyseal femur fractures, in patients who take bisphosphonates for osteoporosis. This information will be added to the *Warnings and Precautions* section of the labels of all bisphosphonate drugs approved for the prevention or treatment of osteoporosis."

75. The FDA further announced that it would be requiring a new Limitations of Use Statement in the *Indications and Usage* section of the label and would be requiring that a Medication Guide be included with all bisphosphonates medications approved for osteoporosis.

76. Thus, for the first time, Defendants included new information in their labeling indicating reports of a possible association between Fosamax and atypical femur fractures. However, as with osteonecrosis of the jaw injuries, Defendants minimized the significance of the reports and indicated that there is no proof that Fosamax causes femur fractures.

77. Defendants did not issue a black box warning, nor did they list the new information concerning femur fractures in the WARNINGS section of the label. Instead, Defendants included the information in the PRECAUTIONS section of the label and characterized the association of Fosamax and femur fractures as if it were a mere overlap in the reporting.

78. The PRECAUTIONS section of Defendants' label states, "Atypical, low-energy, or low trauma fractures of the femoral shaft have been reported in bisphosphonates-treated patients. These fractures can occur anywhere in the femoral shaft from just below the lesser trochanter to above the suprachondylar flare and are transverse or short oblique in orientation without evidence of comminution. Causality has not been established as these fractures also occur in osteoporotic patients who have not been treated with bisphosphonates."

79.     Thus, Defendants continue to deny in their Fosamax labeling a causal relationship between the use of Fosamax and atypical femur fractures.

80.     Despite Defendants' continued denial of a causal relationship between Fosamax and atypical femur fractures, the evidence continues to increase in support of such a relationship.

81.     Most recently, on February 23 2011, the findings of a long-term study were published in the Journal of the American Medical Association entitled *Bisphosphonate Use and the Risk of Subtrochanteric or Femoral Shaft Fractures in Older Women*.  The article noted that "case reports and conflicting findings from small observational studies have left clinicians and patients uncertain about whether bisphosphonates increase the risk of subtrochanteric or femoral shaft fractures."  Thus, the population-based, nested case-controlled study examined the association between bisphosphonate use and fractures in postmenopausal women who used bisphosphonates between April 2002 and March 2008.  The study concluded that patients on long-term bisphosphonates for osteoporosis therapy had a 274% higher chance of subtrochanteric femur fractures than similar matched patients.  The researchers concluded that "our findings provide strong evidence that prolonged bisphosphonate therapy is associated with an increased risk of subtrochanteric or femoral shaft fracture. . . ."

82.     Thus, there is sound epidemiologic evidence that the use of Fosamax can cause atypical femur fractures and that patients using Fosamax for prolonged periods of time are at an increased risk of suffering such injuries.

83.     Despite the causal connection between Fosamax and its generic equivalent and atypical femur fractures, Defendants placed Fosamax into the stream of worldwide commerce and interstate commerce in the United States.  They did so without adequate testing and with no warning that the drug carried with it a risk of causing atypical femur fractures.

84.     Defendants, either directly or though their agents, apparent agents, servants, or employees, designed, manufactured, marketed, advertised, distributed, and sold Fosamax for the treatment of osteoporosis, Paget's Disease, and other uses.

85.     Defendants expected, or should have expected, that its business activities could or would have consequences within the State of Colorado or any other state where its product is used.

86.     As a result of the defective nature of Fosamax, Plaintiff suffered and continues to suffer severe and permanent personal injuries, including a fracture of her left femur and the residual effects of this injury.

87.     Defendants concealed and continue to conceal their knowledge of Fosamax's unreasonably dangerous risks from Plaintiff Peggy Foley, other consumers, and the medical community.

88.     Defendants failed to conduct adequate and sufficient post-marketing surveillance of Fosamax after it began marketing, advertising, distributing, and selling the drug.

89.     As a result of Defendants' actions and inaction, as described herein, Plaintiff Peggy Foley was injured due to her ingestion of Fosamax, which has caused and will continue to cause her various injuries and damages.  Plaintiff accordingly seeks compensatory damages.

## Plaintiff's Use of Fosamax and Her Resulting Injuries

90.     As a result of Defendants' claim regarding the effectiveness and safety of Fosamax, Plaintiff's medical provider prescribed and Peggy Foley began using Fosamax in or around the beginning of 2001.  On or about July 17, 2008, Plaintiff Peggy Foley switched to the generic equivalent Alendronate Sodium.  Plaintiff Peggy Foley continued taking Fosamax and/or Alendronate Sodium, including Alendronate Sodium manufactured and distributed by Teva, until approximately September 23, 2009, when she was switched to Reclast.

91.    As a direct and proximate result of using Fosamax and its generic equivalent, Plaintiff Peggy Foley suffered a transverse fracture of the subtrochanteric region of her left femur.

92.    Specifically, on or about July 23, 2009, while using Fosamax, Plaintiff Peggy Foley suffered a left subtrochanteric femur fracture, which required surgical repair involving placement of an intramedullary nail in her left femur.

93.    Plaintiff Peggy Foley was hospitalized, underwent surgical procedures and physical rehabilitation, and has endured significant pain and suffering as a result of her femur fracture.

94.    Plaintiff Peggy Foley remains at a significantly increased risk for femur fractures and possible osteonecrosis of the jaw.

95.    Prior to, and during, Plaintiff's use of Fosamax[1], Defendants knew or should have known that the use of Fosamax created an unreasonable increased risk of osteonecrosis of the jaw and femur fractures, and that when taken as directed, such use of Fosamax was unreasonably dangerous to consumers.

96.    Despite the fact that Defendants knew or should have known of the serious health risks and complications caused by the use of Fosamax, Defendants failed to adequately and sufficiently warn consumers, including Plaintiff Peggy Foley, or the medical community, of such risks.

97.    Had Plaintiff Peggy Foley and/or her health care providers known of the increased risk and dangers associated with Fosamax, she would not have used the product and would not have suffered a femoral fracture on July 23, 2009.

---

[1] The use of "Fosamax" from hereon in the Complaint specifically includes the generic version where appropriate.

98.     At the time Plaintiff suffered the femoral fracture, she did not know and had no reason to believe that her femoral fracture was caused by her use of Fosamax, or that her injuries could have been caused by the actions, omissions, or misconduct of Defendants.   Indeed, Plaintiff continued to use Fosamax after suffering her femoral fracture, not knowing that she was placed at an increased risk of serious injury and harm due to her use of Fosamax.

99.     Indeed, it was not until October 13, 2010, that the FDA finally announced that the labeling for Fosamax would be changed to include warnings of the risk of femur fractures associated with Fosamax.

100.    Prior to October 13, 2010, when the FDA announced the labeling change for Fosamax, Plaintiff did not know and could not have known in the exercise of due diligence, that her injuries were caused by her use of Fosamax, the generic equivalent, and/or Defendants' wrongful conduct.

101.    Had Plaintiff Peggy Foley and/or her health care providers known of the increased risks and dangers of femur fractures associated with Fosamax, she would not have used the product, would not have suffered a femoral fracture, and would not have suffered the pain, injury, and economic damage described herein.

102.    As a direct and proximate result of her use of Fosamax, Plaintiff suffered significant harm, physical injury, conscious pain and suffering, and bodily impairment, including but not limited to suffering a femoral fracture, undergoing a surgical procedure to repair the fracture, experiencing complications from surgery, suffering extended hospitalization, undergoing physical therapy and rehabilitation, and constantly enduring pain in her legs and throughout the rest of her body to this day.   Plaintiff's injuries may have caused permanent effects and may continue in the future to cause her physical impairments and damages that will affect her throughout her life.

103. As a direct and proximate result of her use of Fosamax, Plaintiff Peggy Foley has also suffered mental anguish and emotional distress in connection with her injuries and the knowledge that Plaintiff will have life-long complications as a result of her use of Fosamax and resulting injuries.

104. As a direct and proximate result of her use of Fosamax, Plaintiff Peggy Foley has also suffered, and will continue to suffer, economic losses in the form of medical expenses, inability to maintain gainful employment, and other pecuniary losses resulting from her injuries.

## FIRST CAUSE OF ACTION

### Strict Products Liability
### Defective Manufacturing

105. Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

106. Defendants are the manufacturers, designers, distributors, sellers, and/or suppliers of Fosamax or the generic equivalent (collectively "Fosamax").

107. The Fosamax manufactured, designed, sold, distributed, supplied and/or placed in the stream of commerce by Defendants was defective in its manufacture and construction such that it was unreasonably dangerous, was not fit for the ordinary purpose for which it was intended, and/or did not meet the reasonable expectations of an ordinary consumer.

108. The Fosamax manufactured, designed, sold, distributed, supplied and/or placed in the stream of commerce by Defendants, was defective in its manufacture and construction as described at the time it left the Defendants' control.

109. As a direct and proximate result of Plaintiff's use of Fosamax as manufactured, designed, sold, supplied and introduced into the stream of commerce by Defendants, Plaintiff

Peggy Foley suffered personal injury, economic and non-economic damages, and will continue to suffer such harm, damages, and economic loss in the future.

## SECOND CAUSE OF ACTION

### Strict Products Liability
### Design Defect

110.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

111.    Defendants are the manufacturers, designers, distributors, sellers, and/or suppliers of Fosamax or the generic equivalent (collectively "Fosamax").

112.    The Fosamax manufactured, designed, sold, distributed, supplied and/or placed in the stream of commerce by Defendants was defective in its design such that it was unreasonably dangerous, was not fit for the ordinary purpose for which it was intended, and/or did not meet the reasonable expectations or an ordinary consumer.

113.    At the time Defendants manufactured, designed, distributed, sold, and/or supplied the Fosamax into the stream of commerce, a safer, more practical, alternative design was available.

114.    The Fosamax manufactured, designed, sold, distributed, supplied, and/or placed in the stream of commerce by Defendants, was defective in design as described above at the time it left the Defendants' control.

115.    As a direct and proximate result of Plaintiff's use Fosamax as manufactured, designed, sold, supplied and introduced into the stream of commerce by Defendants, Plaintiff Peggy Foley suffered personal injury, economic and non-economic damages, and will continue to suffer such harm, damages, and economic loss in the future.

### THIRD CAUSE OF ACTION

**Strict Products Liability
Defect Due To Inadequate Warning**

116.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

117.    Defendants are the manufacturers, designers, distributors, sellers, and/or suppliers of Fosamax or the generic equivalent (collectively "Fosamax").

118.    The Fosamax manufactured and supplied by Defendants was defective due to inadequate warning or instruction, because Defendants knew or should have known that the product was unreasonably dangerous in that it created a substantial increased risk of serious bodily harm and death to reasonably foreseeable consumers such as Plaintiff Peggy Foley, and Defendants failed to adequately warn consumers and/or their health care providers of such increased risk.

119.    The Fosamax manufactured and supplied by Defendants was also defective due to inadequate post-marketing warning or instruction, because, after Defendants knew or should have known of the risk of serious bodily harm and death from the use of Fosamax, Defendants failed to provide adequate warning to consumers and/or their health care providers of the product, knowing the product could cause serious injury and death.

120.    As a direct and proximate result of Plaintiff's use of Fosamax as manufactured, designed, sold, supplied and introduced into the stream of commerce by Defendants, Plaintiff Peggy Foley suffered personal injury, economic and non-economic damages, and will continue to suffer such harm, damages, and economic loss in the future.

**FOURTH CAUSE OF ACTION**

**Strict Products Liability**
**Defect Due To Failure To Adequately Test**

121.   Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

122.   Defendants advised consumers and the medical community that Fosamax and the generic equivalent (collectively "Fosamax") contained the same safety profile as other bisphosphonates and other methods of treating osteoporosis.   However, Defendants failed to adequately test the safety of Fosamax versus other bisphosphonates and other methods of treating osteoporosis.

123.   Had Defendants adequately tested the safety of Fosamax and disclosed the results to the medical community or the public, Plaintiff would not have used, and her physician would not have prescribed, Fosamax.

124.   As a direct and proximate result of Defendants' failure to adequately test the safety of Fosamax, Plaintiff Peggy Foley suffered personal injury, economic and non-economic damages, and will continue to suffer such harm, damages, and economic loss in the future.

**FIFTH CAUSE OF ACTION**

**Negligence**

125.   Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

126.   Defendants had a duty to exercise reasonable care in the manufacture, design, sale, distribution, supply, marketing, and/or placement of Fosamax and its generic equivalent (collectively "Fosamax") into the stream of commerce, including a duty to ensure that its product did not pose a significantly increased risk of bodily harm and adverse events.

127.    Defendants failed to exercise ordinary care in the design, formulation, manufacture, sale, testing, quality assurance, quality control, labeling, marketing, promotions and distribution of Fosamax into interstate commerce in that Defendants knew, or should have known, that the product caused such significant bodily harm or death and was not safe for use by consumers.

128.    Defendants also failed to exercise ordinary care in the labeling of Fosamax and failed to issue to consumers and/or their health care providers adequate warnings of the increased risk of serious bodily injury or death due to the use of Fosamax.

129.    Despite the fact that Defendants knew or should have known that Fosamax posed a serious increased risk of bodily harm to consumers, Defendants continued to manufacture and market Fosamax for use by consumers, and Defendants continue to do so today.

130.    Defendants knew or should have known that consumers, such as Plaintiff Peggy Foley, would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

131.    As a direct and proximate result of Defendants' negligence, Plaintiff Peggy Foley suffered personal injury, economic and non-economic damages, and will continue to suffer such harm, damages, and economic loss in the future.

## SIXTH CAUSE OF ACTION

### Breach of Express Warranty

132.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

133.    Defendants expressly warranted that Fosamax and its generic equivalent (collectively "Fosamax") were a safe and effective prescription drug for treatment and prevention of osteoporosis.

134.    The Fosamax manufactured and sold by Defendants did not conform to these express representations because it caused serious injury to consumers who used the product when taken in the recommended dosages.

135.    As a direct and proximate result of Defendants' breach of warranty, Plaintiff Peggy Foley suffered personal injury, economic and non-economic damages, and will continue to suffer such harm, damages, and economic loss in the future.

## SEVENTH CAUSE OF ACTION

### Breach of Implied Warranty

136.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

137.    At the time Defendants manufactured, marketed, sold, and distributed Fosamax and its generic equivalent (collectively "Fosamax"), Defendants knew of the use for which Fosamax was intended and impliedly warranted Fosamax to be of merchantable quality, fitness, and safety for such use.

138.    Plaintiff Peggy Foley and her health care provider reasonably relied upon the skill and judgment of Defendants as to whether Fosamax was of merchantable quality and safe for its intended use and upon Defendants' implied warranty as to such matters.

139.    Contrary to the implied warranty, Defendants' product Fosamax was not of merchantable quality or safe for its intended use, because it was unreasonably dangerous as described herein.

140.    As a direct and proximate result of Defendants' breach of warranty, Plaintiff Peggy Foley suffered personal injury, economic and non-economic damages, and will continue to suffer such harm, damages, and economic loss in the future.

## EIGHTH CAUSE OF ACTION

## Negligent Misrepresentation and Fraud

141.   Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

142.   Defendants are the manufacturers, designers, distributors, sellers or suppliers of Fosamax and/or its generic equivalent (collectively "Fosamax") and, while engaged in the course of such business, made representations to Plaintiff Peggy Foley and her physician regarding the character and/or quality of Fosamax for guidance in their decision to select Fosamax for Plaintiff Peggy Foley's use.

143.   Specifically, Defendants represented that their product was just as safe as, and just as effective or more effective than, other bisphosphonates on the market.

144.   Defendants' representations regarding the character or quality of Fosamax were untrue.

145.   Defendants had actual knowledge based upon studies, published reports and clinical experience that its product Fosamax created an unreasonable increased risk of osteonecrosis of the jaw, atypical femur fractures, and other serious bodily injury and death to consumers, or should have known such information.

146.   Defendants negligently and/or intentionally misrepresented or omitted this information in their product labeling, promotions and advertisements and instead labeled, promoted and advertised their product as safe and effective in order to avoid losses and sustain profits in their sales to consumers.

147.   In supplying the false information, Defendants failed to exercise reasonable care or competence in obtaining or communicating information to their intended recipients, including Plaintiff Peggy Foley and her physician.

148.    Defendants continue to this day to minimize and downplay the significance of the causal association between Fosamax and osteonecrosis of the jaw and atypical femur fractures in their product labeling and other information provided to physicians and the general public.

149.    In supplying false and misleading information, Defendants have failed to exercise reasonable care or competence in obtaining or communicating information to their intended recipients, including Plaintiff Peggy Foley and her physicians.

150.    Defendants had a duty to disclose to Plaintiff Peggy Foley, her physician, and the public that Fosamax was not safe for human use in that it caused significant life-threatening injuries such as osteonecrosis of the jaw and atypical femur fractures because Defendants had superior knowledge of these facts that were material to Plaintiff Peggy Foley and her physician's decision to use Fosamax.

151.    Plaintiff Peggy Foley and her physician reasonably relied to her detriment upon Defendants' misrepresentations and/or omissions in its labeling, advertisements, and promotions concerning the serious risks posed by the product.  Plaintiff Peggy Foley reasonably relied upon Defendants' representations to her and/or her health care providers that Fosamax was just as safe for human consumption and/or use and effective as other bisphosphonates or other methods of treating and preventing osteoporosis and that Defendants' labeling, advertisements and promotions fully described all known risks of the product.

152.    Had Plaintiff, her physician, and the public known of Defendants' concealment of the true facts and that Fosamax was not safe for human use, Plaintiff would neither have been prescribed nor used Fosamax.

153.    As a direct and proximate result of Defendants' negligent and/or intentional misrepresentations, Plaintiff Peggy Foley suffered personal injury, economic and non-economic damages, and will continue to suffer such harm, damages, and economic loss in the future.

## NINTH CLAIM FOR RELIEF

**Violation of Colorado's Consumer Protection Act**
**C.R.S.§ 6-1-101, et. seq.**

154.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

155.    Plaintiff Peggy Foley is a person within the meaning of Colorado Consumer Protection Act (the "Act").

156.    Defendants are persons within the meaning of the Act for all purposes therein.

157.    Plaintiff Peggy Foley is a person entitled to bring a claim pursuant to the Act.

158.    The false, deceptive and misleading statements and representations made by Defendants alleged above are Deceptive Trade Practices within the meaning of the Act.

159.    Defendants engaged in the Deceptive Trade Practices alleged above, and those Deceptive Trade Practices occurred or were committed in the course, vocation or occupation of Defendants' pharmaceutical business.

160.    The Deceptive Trade Practices that Defendants committed as alleged above significantly impact the public as actual or potential customers of Defendants.

161.    As a direct and proximate result of the Deceptive Trade Practices committed by Defendants as alleged above, Plaintiff Peggy Foley suffered injuries, damages and losses as alleged herein.

162.    Plaintiff is entitled to all damages permitted by C.R.S.§ 6-1-113 of the Act, including actual damages sustained, civil penalties, attorneys' fees, and costs of this action. Also, the State of Colorado is entitled to statutory penalties from defendants for each violation of the Act pursuant to C.R.S.§ 6-1-112.

## TENTH CLAIM FOR RELIEF

### Outrageous Conduct

163.     Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

164.     Defendants' reckless concealment from Plaintiff and her physician that Fosamax and its generic equivalent (collectively "Fosamax") were not safe for use was extreme and outrageous conduct, and such conduct is so outrageous in character and so extreme in degree that it goes beyond all possible bounds of decency and is atrocious and utterly intolerable in a civilized community such as the State of Colorado.

165.     As a direct and proximate result of Defendants' extreme and outrageous conduct, Plaintiff Peggy Foley suffered severe emotional distress, personal injury, economic and non-economic damages, and will continue to suffer such harm, damages, and economic loss in the future.

## ELEVENTH CLAIM FOR RELIEF

### Fraudulent Concealment

166.     Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

167.     Upon information and belief, at the time Plaintiff Peggy Foley used Fosamax and its generic equivalent (collectively "Fosamax"), Defendants had actual information and/or had reason to believe that their prescription drug Fosamax presented an increased risk of atypical femur fractures in patients such as Peggy Foley.

168.   Despite such knowledge, Defendants concealed this information from Plaintiff Peggy Foley, her prescribing physicians, and from the general public in their advertisements, promotions, marketing, and labeling of Fosamax.

169.   As a direct and proximate result of Defendants' fraudulent concealment, Plaintiff Peggy Foley suffered personal injury, economic and non-economic damages, and will continue to suffer such harm, damages, and economic loss in the future.

170.   Furthermore, as a direct and proximate result of Defendants' fraudulent concealment, Plaintiff Peggy Foley did not know and could not have known that her femur fracture was caused by Defendants' wrongful conduct as described herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against the Defendants on each of the above-referenced claims and Causes of Action and as follows:

1.   Compensatory damages in excess of the jurisdictional amount, including but not limited to compensation for injury, pain, suffering, mental anguish, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2.   Economic damages in the form of medical expenses, out-of-pocket expenses, lost income, lost earning capacity, and other economic damages in an amount to be determined at trial of this action;

3.   Attorneys' fees, expenses, and costs of this action;

4.   Plaintiff reserves the right to amend this Complaint to pursue punitive damages in accordance with Colorado law; and

5.   Such further relief as this Honorable Court deems necessary, just, and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

Dated:  July 6, 2011                                    RESPECTFULLY SUBMITTED,


_/s/ Calvin S. Tregre Jr._
Janet G. Abaray
Calvin S. Tregre, Jr.
**BURG SIMSPON**
**ELDREDGE HERSH & JARDINE, P.C.**
213 Walnut Street, Suite 2090
Cincinnati, OH 45202
Tel: (513) 852-5600
Fax: (513) 852-5611
jabaray@burgsimpson.com
ctregre@burgsimpson.com

Attorneys for Plaintiff
Peggy Foley
22 Aberdeen Bluff
Pueblo CO 81004